**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SOLOMON AGENCY CORP.,

                Plaintiff,

    - against -

SUK JUN CHOI, a/k/a JUNE CHOI,

                Defendant.

16 Civ. 353 (LDH) (RML)

**AFFIRMATION OF**
**<u>JUNE CHOI</u>**

JUNE CHOI states as follows:

1.     I am the defendant in the above-captioned action.  I submit this affirmation in opposition to the Motion for a Preliminary Injunction, dated January 22, 2016, filed by the plaintiff Solomon Agency Corp. ("Solomon").

**<u>Background</u>**

2.     I was born in South Korea in 1967 and graduated from Hanyang University with a B.A. degree in 1993.  I came to the United States in 1998 and graduated from Baruch College (CUNY) with an M.B.A. in Accounting in 2003.  I passed the C.P.A. exam in New York later that year.  I legally changed my name from Suk Jun Choi to June Choi.

3.     In July 2004, I started working at Solomon, which had agreed to sponsor me under the H1-B visa program.  I became a US citizen on March 30, 2013.  I met and married my wife, Yun Ju Jeong, in 2004.  We had our first child, a boy, in September 30, 2010.  My wife and I bought a home in Leonia, N.J. in 2010, where we live.  My wife recently gave birth to twin girls on January 21, 2016.

**Solomon Agency Corp.**

4.      When I started work at Solomon in 2004 the insurance brokerage business was primarily Property & Casualty (P&C) coverage.  Solomon also had a very small group benefit plan business at the time that was later was put under a separate division called E-Benefits Solutions in 2007.  Due to my background and hard work, I took control of the group benefit plan business and grew sales from $1.9 million in 2005 to more than $40 million by 2014. Typically, the average commission percentage is 3% on sales.  Thus, I was responsible for revenue growth in this singular product line from about $60,000 a year in premiums to over $1,200,000 per year when I left.  That represents an almost 2,000% growth in just 10 years, or annual growth of roughly 200%.

5.      Unlike other insurance products, where brokers primarily write or renew policies for a single client and follow-up on claims by that client, employee benefits requires daily monitoring and client interaction.  This is because employee benefits include, medical, dental, vision, long-term and short-term disability, and prescription drugs, among many other programs. This is compounded by the fact that the benefits must be managed for each of the thousands of employees of a company that make claims, in addition to the hundreds of employees that join and leave a company throughout the year.

6.      The task is further complicated by the fact that medical coverage requires a deep knowledge and understanding of the processes of dozens of private insurance companies, the Affordable Care Act ("ACA"), COBRA, ERISA, and HIPAA, among other things.  Finally, many clients are foreign conglomerates, so we must deal with international labor issues, a complex web of affiliated divisions of a single client company, a limited understanding by our clients of the US health care system, and language issues.

7.      One of the clients in this area with whom I have worked closely is the SK Group ("SK"), one of the largest conglomerates in Korea.  SK is divided into geographic divisions, such as SK USA, which is the umbrella entity that manages the US-based businesses of the SK Group. SK has about 25 separate affiliated divisions.  Each of these entities employs hundreds of persons in the United States, all of whom are covered by the employee benefits sold and managed by me and the several other individuals I had trained in my department at Solomon. Unlike other companies, SK does not maintain an internal benefits department.  Therefore, my group at Solomon fulfilled that role for SK.

**Resignation from Solomon in May 2015**

8.      After 11 years at Solomon, I was "burned out" and needed a break.  Working conditions under Mr. Ha, the CEO and sole owner of Solomon, were very difficult.  Mr. Ha constantly yelled at employees, paid poorly, threatened employees constantly with termination, and made salary and bonus promises that often were not honored.

9.      Despite growing the E-Benefits Solutions business dramatically and spending long hours at the office managing the complex arrangements of our clients, my salary had increased only modestly in the eleven years I worked at Solomon.  My department met its sales goals ten consecutive years up to 2014.  Nevertheless, I was never given an employment agreement or offered equity in the business.  I was at all times simply an "at will" employee at Solomon, working at the mercy and whim of Mr. Ha.

10.     The only employment-related document I was ever asked to sign at Solomon was an employee handbook, which Mr. Ha presented to me on January 9, 2014.  Mr. Ha did not explain the document to me.  He only presented me the signature page to sign before receiving

- 3 -

my bonus check.  Unless I signed the document right there, I would not receive my bonus check. This document was not an employment agreement, and I did not understand it to be such.

11.     Although my department exceeded the very high end of its sales goals for 2014, Mr. Ha did not pay me the year-end bonus and salary increase for 2015 we had discussed the year before.  Mr. Ha said that the other departments were not profitable and therefore there wasn't sufficient profit to honor my salary deal.

12.     In 2014 my staff at Solomon consisted of James Lee, Jenny Lee, Hyejung Yu, Soomin Kim, and Jin Park.  Each of these people had been properly trained by me over the years to provide effective service to the client accounts, including SK.  None of these people currently works at Solomon.

13.     In January 2015, I advised Mr. Ha that I intended to resign from Solomon as soon as he trained a replacement for me.  I told Mr. Ha that I was exhausted and planned to take some time off from working.  My wife and I had saved some money, and we intended to live off that savings until I decided what I wanted to do next with my life.

14.     I continued to work at Solomon as usual.  In fact, I wrote two new large group policies in March and April 2015, accounting for about $4 million in additional premiums.  I did not announce my resignation to anyone at Solomon or to any clients during this period.

15.     Mr. Ha made no effort to assign or train my replacement in the more than three months since I told him of my intention to resign.  During this time, my wife became pregnant with twins and I wanted to leave work at Solomon to help her through this difficult pregnancy. Therefore, on April 30, 2015, I emailed Mr. Ha to inform him that I could not wait any longer and noticed my resignation effective on May 31, 2015, regardless of whether he had a replacement for me by then or not.

16.     On May 1, 2015, the announcement of my resignation was emailed to Solomon clients.  In this email, clients were advised to work with Chris Pak (VP at Solomon) and James Lee (General Manager of E-Benefit Solutions).

17.     Chris Pak came to me after the announcement and asked me to train him, along with James Lee and Simon Lee, the HR Manager at Solomon.  I trained the group two days a week, three to four hours per day for four weeks.  I made it clear to them, however, that it was practically impossible to understand my job in one month – it was just too complicated.  So, I offered to continue to train them after I left the company on May 30, if they wanted.

18.     On May 28, 2015, Mr. Ha and I had a casual lunch at a Chinese restaurant across the street from Solomon's office.  We did not discuss my resignation at length.  As we walked back to the office, Mr. Ha told me that he would pay me a six-month severance package in appreciation of the 11 years of service to the company.  I told him "thank you."

19.     At 5:00 P.M. on Friday, May 29, 2015, Mr. Ha called me into his office and we talked for about 30 minutes in what might be characterized as an "exit interview."  In that meeting, I gave Mr. Ha some advice on how to manage my clients in my absence and told him that I wanted to keep a good relationship with Solomon as a possible strategic alliance in the future, depending on what I decided to do.  I also offered to continue to train the replacement team, but Mr. Ha told me that was unnecessary and that Solomon could manage on its own.

20.     I asked Mr. Ha at this meeting how Solomon would handle SK's annual CFO workshop that was scheduled for the middle of June.  This was a crucially important meeting to report financial performance of SK's self-funded plan.  I had been a presenter at these workshops for years and the presentation requires expert knowledge of every facet of the benefits business, detailed analysis of the financial results, and good communication skills.  Mr. Ha told me that

- 5 -

they could handle it and that he did not want me to get involved.  I replied that he could do what he wanted but it was unlikely that his team could properly prepare in time.

21.     At the end of this meeting, Mr. Ha handed me a document entitled "Termination of Employment & Release" (the "Agreement").  He wanted me to sign it on the spot, but I told him that I needed to review it closely.  After reviewing the document closely with counsel, it was clear that the terms were unreasonable, extremely harsh, and unnecessary.  Furthermore, Mr. Ha made receipt of the promised severance payments contingent upon my signing the Agreement. (A copy of the Agreement is attached hereto as **Exhibit A**.)

**Post-Resignation Problems With the SK Account**

22.     On June 9, 2015, I sent an email to Mr. Ha stating that I would not sign the Agreement because the terms were odious and non-standard.  I suggested several revisions for him to consider.  I also informed him that SK had approached me directly and independently after my resignation to help them with their June workshop, and that I wanted to let Solomon know that SK said that Mr. Ha had approved my involvement.  I was seeking confirmation of this from Mr. Ha directly.  I also expressed my displeasure to Mr. Ha at what I considered some underhanded "hard tactics" against me, including the cancellation of my medical insurance, which was particularly important as my wife was going through a difficult pregnancy with twins. (A copy of my June 9, 2015 email is attached hereto as **Exhibit B**.)

23.     SK told me that prior to the June workshop, Solomon asked if Mr. Ha, Chris Pak, James Lee and others could attend – not as presenters, but just as observers.  SK told Solomon that they could not attend because it was an internal event at which a lot of confidential information would be discussed.  Instead, SK allowed James Lee (my official replacement) to attend as an observer because he was designated to SK Group Service.

- 6 -

24.     In the weeks following my departure from Solomon, SK experienced serious service problems in its benefits program managed by Solomon, including daily eligibility transactions, monthly billing and reconciliation, compliance support, and reporting. SK contacted me directly and asked me to help resolve monthly billing and reconciliation issues which needed particularly urgent attention. I contacted Chris Pak at Solomon to ask if I could get involved and he said "yes" because SK had already contacted him and demanded that he get my help to straighten out the mess.

25.     On June 19, 2015, Chris Pak and James Lee of Solomon and David Matsushita of Savoy Associates, a general agency that partnered with Solomon on certain accounts such as SK, visited SK's offices in New York to discuss Solomon's poor service performance since my departure. At that meeting, I understand that SK warned Solomon that SK would terminate its relationship with Solomon and find a new agency if Solomon could not maintain the level of service when I was working at Solomon. (A copy of an email from Jane Choi (no relation) of SK to me, dated June 22, 2015, describing the June 19 meeting with Solomon representatives is attached hereto as **Exhibit C**.)

26.     In addition to the routine administrative services Solomon was messing up, SK had grave concerns about Solomon's ability to handle compliance issues that I had supported for years, such as ERISA, ACA, COBRA, and HIPAA. As a result, in late June 2015, SK called me into their offices and asked me to become their broker. I said that I did not want to do that because I wanted to stay at home to help my wife, and because I did not want to complicate my relationship with Solomon. However, I told SK that I would be happy to assist them if Solomon agreed to the arrangement.

**Post-Resignation Work for SK with Solomon's Approval**

27.     On July 9, 2015, SK appointed me their Benefit Administrator so that I could have access to their files and assist them with their accounts. The appointment letter was copied to Chris Pak at Solomon and David Matsushita at Savoy Associates. (A copy of the July 9, 2015 appointment letters from SK USA, Inc. to Empire BlueCross BlueShield and Munich Re Stop Loss, Inc. are attached hereto as **Exhibit D**.)

28.     Contemporaneous emails between me and SK regarding these appointment letters makes clear that it was done at SK's urging and that I wanted Solomon to be aware of and consent to the arrangement. This was done. Indeed, as Jane Choi of SK noted in her email: "Personally, I think Chris [Pak of Solomon] may be relieved that you are being involved." (A copy of the July 9, 2015 emails between me and Jane Choi of SK is attached hereto as **Exhibit E**.)

29.     In mid-July 2015, Mr. Neung Koo Kim ("NK Kim"), President of SK USA, Inc., summoned Mr. Ha, the CEO of Solomon, to his New York office, where NK Kim again told Solomon that SK was dissatisfied with its failing service, and that SK intended to retain a new agency to handle the account if problems persisted. SK advised Mr. Ha to find a way to get me involved in the business relationship again. Shortly after the SK meeting, Mr. Ha called me for the first time since I left the agency and asked to meet.

30.     Just before my meeting with Mr. Ha on July 28, 2015, Simon Lee, the HR Manager at Solomon, called to ask if we could revisit the Agreement I refused to sign in June.

31.     At the July 28 meeting, Mr. Ha asked me what I wanted. I said that I did not want anything from Solomon and that I did not intend to sign the Agreement. I told Mr. Ha that I would accept the severance package (6 months' salary + 6 months medical coverage for my

- 8 -

family) only if it was given without conditions or restrictions.  Mr. Ha agreed to pay me the severance without conditions or restrictions in appreciation of my 11 years of service.

32.     Mr. Ha then offered to separately compensate me for supporting Solomon on behalf of SK since leaving in June.  I told him that I was not assisting Solomon.  Rather, I was independently assisting SK at their request and Solomon's agreement, and that I did not want compensation from Solomon.  As a matter of fact, I was not being compensated by SK either for the work I was doing at this time.

33.     Mr. Ha then asked me to train a new Solomon employee, Daniel Mendoza, who had been recently assigned to the SK account in place of James Lee who had utterly failed and was fired.  I told Mr. Ha that I thought Daniel Mendoza was not the right person for the job because he did not have prior experience in this industry and did not speak Korean.  Mr. Ha would not listen to me and insisted that Mr. Mendoza was the right person for the job.  So, I agreed to work with Daniel Mendoza to train him on the SK account.

34.     Mr. Ha insisted that he pay me something for my work so I agreed to charge Solomon a "service fee" of $50/hr for the time I worked on SK matters.  This work was not done as an employee of Solomon, but as an independent contractor.  I understand that Mr. Ha asked Savoy Associates to pay part of my fees.

35.     Solomon paid me only five of the six promised severance payments and has failed and refused to pay the final installment of $10,073.80.

36.     I prepared invoices for Solomon reflecting the time I spent on SK matters since my resignation on May 31, 2015.  Those invoices reflect time I spent on SK matters from June 1 – November 30, 2015.  Solomon has paid these invoices in full.  (Copies of these Solomon invoices are attached hereto as **Exhibit F**.)

- 9 -

37.    For three months (August – October) I trained Daniel Mendoza and Chulhee Lee (an IT Manager) at Solomon's New Jersey office, which was much closer to my home, usually 3-4 hours per session.  My training was based upon a transition check list I had prepared before I left Solomon in May.  However, as I predicted from the outset, Mr. Mendoza had difficulty understanding the business and handling the SK account.

38.    Despite my best efforts, Daniel Mendoza committed several serious errors on the SK account, including: (i) messing up billing for two consecutive months (Aug. – Sept.) which required that I take over this function from Solomon; (ii) delivering incorrect benefit information to SK affiliates; (iii) delivering the confidential plan information of one affiliate company to a another affiliate company; (iv) enrolling employees in the wrong affiliate program; (v) failing to properly administer COBRA, which resulted in SK unnecessarily paying benefits for a terminated employee for four additional months; (vi) complicating renewal negotiations by contacting an insurance carrier directly without permission; and (vii) communicating to carriers, SK employees, and SK affiliates in an unprofessional and inappropriate manner.

39.    As a result of Solomon's incompetence in handling the SK account, I had to take back most of the responsibility for the account, and Solomon was left to handle only simple eligibility transactions and COBRA notices. Solomon was happy to have me handle this work, and I did so with their full knowledge and consent.

**SK Terminates Solomon as its Broker Due to Incompetence**

40.    In mid-November 2015, SK again asked me to become their service broker.  I told SK that I would contact Solomon in order to work out a fair co-broker arrangement.  I called Mr. Ha multiple times but he did not return my calls until December.

41.     On December 7, 2015, I finally met with Mr. Ha but for less than one hour.  I explained to him that SK was dissatisfied with Solomon's service and likely would not renew them as its broker for 2016.  I explained to Mr. Ha that I had kept things together for Solomon as a part-time independent contractor for the past six months getting paid only $50/hr and that I was unwilling to continue to do this in 2016.  I suggested that we work out a co-broker situation that would be for the benefit of all parties' interests.  Mr. Ha didn't respond to my suggestion and left the meeting.

42.     On December 16, 2015, SK notified Solomon in writing that it was changing its service broker. (A copy of the December 16, 2015 letter from SK to Solomon is attached hereto as **Exhibit G**.)

43.     The next day I asked SK to give me a final chance to persuade Solomon to work as a co-broker with me on its account.  I had SK send me two separate BOR Change Request Letters, one that had me as the sole broker, and one that had me and Solomon as co-brokers.  I tried to reach Mr. Ha to discuss this proposal but he did not return my calls until December 23, 2015.

44.     On the December 23 call, I asked Mr. Ha if he wanted to be a co-broker with me on the SK account with a 75/25% broker fee split, with me receiving the larger share.  He did not answer me and hung up.

## Solomon Files This Lawsuit

45.     The next day, December 24, 2015, I received a threatening letter from Mr. Ha's lawyers claiming that I had breached my "employment agreement" with Solomon and had stolen the SK account from it.  (A copy of the December 24 letter from Solomon's counsel is attached hereto as **Exhibit H**.)

46.     That same day, and without any consult from legal counsel, I responded to the lawyer letter with a point-by-point refutation.  (A copy of my December 24 email to Mr. Koo of Yoon & Kim LLP is attached hereto as **Exhibit I**.)

47.     On December 28, 2015, Solomon's counsel sent me another threatening letter. (A copy of the December 28 letter from Yoon & Kim LLP is attached hereto as **Exhibit J**.)

48.     Later that same day I sent another short email back to Solomon's counsel reiterating their incorrect assessment of the facts.  (A copy of my December 28 email to Ms. Koo and Mr. Yudin of Yoon & Kim LLP is attached hereto as **Exhibit K**.)

49.     On December 30, 2015, Solomon's counsel sent a threatening letter directly to NK Kim, the President of SK USA, Inc., claiming that I was in breach of a non-compete provision by becoming SK's BOR ("Broker of Record") and threatening a lawsuit.  (A copy of the December 30 letter from Yoon & Kim LLP to SK is attached hereto as **Exhibit L**.)

50.     On January 19, 2016, Chris Pak of Solomon called me to say that I would soon be served with a lawsuit from Solomon and that Mr. Ha made him sign an affidavit for that lawsuit. He apologized to me for having to sign the affidavit rather than Mr. Ha himself.  He wished me the best of luck in the lawsuit.  I thanked him for the call and told him I understood the position he was in with his boss.

51.     Pursuant to 28 U.S.C.A. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        February 17, 2016

June Choi

- 12 -