UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SOLOMON AGENCY CORP.

                           Plaintiff,

-against-

SUK JUN CHOI, a/k/a JUNE CHOI

                           Defendant.
------------------------------------------------------------x

**MEMORANDUM OF DECISION AND ORDER**

16-CV-0353 (LDH)(RML)

LASHANN DEARCY HALL, United States District Judge:

This diversity action arises out of an alleged breach of an employment agreement between Plaintiff Solomon Agency Corp. ("Plaintiff" or "Solomon") and Defendant June Choi ("Defendant" or "Choi") (the "Employment Agreement"). By order to show cause dated January 22, 2016, Plaintiff seeks a preliminary injunction to enjoin and restrain Defendant for a period of two years beginning May 31, 2015, from engaging in any business in competition with Solomon and from soliciting Solomon's customers located within a 50-mile radius of Solomon's offices.

## FINDINGS OF FACT

Solomon is an insurance brokerage company with its principal place of business in Bayside, Queens. Solomon provides insurance services to SK USA, Inc. ("SK") across SK's various businesses. (Compl. ¶ 5, ECF No. 1.) In 2004, Solomon hired Choi under a temporary work visa. (*Id.* ¶ 8.) Choi held various positions at Solomon and by 2012, Choi had been promoted to the position of a "Senior Director." (*Id.*) As a Senior Director, Choi oversaw Solomon's health benefits business. (*Id.* ¶ 11.) In this capacity, Choi, became knowledgeable about the operations of private insurance companies, the Affordable Care Act, and the

1

Employment Retirement Income Security Act of 1974, in addition to other federal laws and programs. (*See* June Choi Aff. ¶ 6, ECF No. 10.) Choi was directly responsible for the complex task of managing benefits for thousands of employees. (*Id.* ¶ 5.) As a result, Choi had significant and regular client interaction with Solomon's clients, including SK. (*See id.* ¶ 7; Compl. ¶ 9; Young Jin Lee Aff. ¶ 2, ECF No. 11.)

In connection with his employment at Solomon, in January 2014, Choi executed a fourteen-page document that was countersigned by Solomon's president, Yong Hwa Ha. (*See* Compl. Ex. A, at 14; Yong Hwa Ha Decl. ¶ 5, ECF No. 15; Choi Aff. ¶ 10.) A review of the first eleven pages of the document suggests the document was designed to serve principally as an employee handbook. (*See* Compl. Ex. A, at 1-11.) Indeed, the first page of the document includes a cover letter from Ha explaining that "[t]his . . . Employee Handbook establishes policies, procedures, benefits and working conditions that will be followed by all Solomon Agency employees as a condition of their employment at the Company." (*Id.* at 1.) The cover letter goes on to state that employment at Solomon is on an "at will" basis, and that the "at will" nature of any individual's employment can be changed only by written agreement signed by Solomon's president. (*Id.*)

At page twelve of the document, the heading "Agreement of Employment" appears at the top of the page. The final three pages include employment details specific to Choi, including his title, annual salary, and duration of employment. Page thirteen of the document includes the non-compete provision at issue here, which provides:

Noncompetition Following Employment

Upon termination of the employment of the Employee, the Employee agrees that
the Employee will not engage in any businesses of Solomon Agency in which
the Employee was engaged at any time during the Term of this Agreement in
competition with Solomon Agency as a representative, agent, or on the

2

> Employee's own behalf, for direct sale to others, either as an officer, director, stockholder, employee, agent or consultant of a corporation or other business organization engaged in such business, or as an employee or as a partner or a co-venturer or in any other capacity, directly or indirectly in competition with Solomon Agency with respect to customers located within a 50 mile radius of Employer's office locations during a period of 2 Years from the date of any termination of the Employee's employment (the "Restriction Period"). Competition as used herein includes, but is not limited to, solicitation of the Employer's customers or doing business with the Employer's customers who are located within the Restriction Area, regardless of the location of the Employee at the time any such solicitation occurs or business is transacted. The Employee acknowledges that the Restriction Period and geographical restriction of this Section are reasonable under the circumstances of the Employee's employment.

(*Id.* at 13.)

Significantly, these final pages do not include any of the generic policies or procedures of the sort set out in the first eleven pages of the document.

By 2015, Choi had become virtually indispensable to Solomon in its service of the SK account. In fact, SK's CFO, Young Jin Lee described Choi as "critical" to the SK business. (Lee Aff. ¶ 3.) In May 2015, citing "burn[]-out," Choi announced his resignation from Solomon. (Choi Aff. ¶¶ 8, 15.) Thereafter, Choi continued to work for Solomon through December 2015 as an "independent contractor," for which he was compensated by Solomon at a rate of $50 per hour. (*Id.* ¶ 34; Compl. ¶ 20.) Choi was initially asked to train Solomon employees to service the SK account in his stead. (Compl. ¶ 20; Choi Aff. ¶ 17.) However, following Choi's resignation, there were "serious service problems" with the SK account, which forced Choi to provide additional support services, and take back much of the responsibility for the account. (Choi Aff. ¶¶ 24-26, 39; Lee Aff. ¶¶ 5-9.)

Notwithstanding Choi's continued involvement with SK's account, SK grew increasingly dissatisfied with Solomon's service of its health benefits business. (*See* Lee Aff. ¶¶ 9-12.) As a result, SK contacted Choi on more than one occasion to ask Choi if he would replace Solomon as

its broker. (*Id.* ¶ 11; Choi Aff. ¶¶ 26, 40.) In a meeting on December 7, 2015, and by phone on December 23, 2015, Choi presented Ha with the opportunity for Solomon to serve as his co-broker on the SK account going forward. (Choi Aff. ¶¶ 41, 44.) Choi contends that during the December 23, 2015 call he went so far as to offer Solomon a 75/25% fee split, with Choi receiving the larger share. (*Id.* ¶ 44 and Ex. H, at 1.) Upon hearing the offer, Ha hung up on Choi. (Choi Aff. ¶ 44.) By mid-December, however, Choi had already informed SK that discussions with Solomon were unsuccessful and he agreed to act as SK's broker of record going forward. (Lee Aff. ¶ 13; *see also* Christian Pak Decl. ¶ 12, Jan. 19, 2016, ECF No. 1-2.) By letter dated December 24, 2015, Solomon advised Choi that his conduct was in violation of the restrictive covenants contained in the Employment Agreement. (*See* Choi Aff. Ex. H.)

## DISCUSSION

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *JBR, Inc. v. Keurig Green Mtn., Inc.*, 618 Fed. App'x 31, 33 (2d Cir. 2015) (citation omitted) (emphasis in original). To successfully seek a preliminary injunction, a moving party must establish: "(1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." *Id.*

Defendant urges the Court to disregard this ordinary standard in favor of a heightened standard, contending that a stricter review is necessary because the injunction sought is either "mandatory" or "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." (Def.'s Mem. in Opp'n 3, ECF No. 9 (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir.

1995).) The Court disagrees. *First*, Defendant fails to cite a single case concerning a restrictive covenant that applies a heightened pleading standard. Indeed, every case cited by Defendant concerning a preliminary injunction to enforce a restrictive covenant applies the standard articulated above. *Second*, courts in this Circuit routinely apply the ordinary standard when deciding whether to issue an injunction in connection with an employment contract. *See e.g., Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 Fed. App'x 43, 45 (2d Cir. 2012) (summary order); *Devos, Ltd. v. Record*, 15-cv-6916, 2015 WL 9593616, at *7 (E.D.N.Y. Dec. 24, 2015); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 194-95 (E.D.N.Y. 2013). *Third*, because this Court finds that the injunction sought is neither mandatory nor will it provide Solomon with all of the relief it seeks, a heightened standard is inapplicable to this case.

I.  Irreparable Harm

The requirement to demonstrate irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Singas Famous Pizza Brands Corp.*, 468 Fed. App'x at 45 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). The party seeking the injunction must show that the harm it alleges is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).

It has been long established that the loss of a client relationship, like SK's, which results from the breach of a non-compete clause, generally constitutes irreparable harm. *See Devos, Ltd. v. Record*, 2015 WL 9593616, at *8 ("Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm.") (quoting *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d

5

525, 531-32 (S.D.N.Y. 2004)); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d at 194-95 (same); *DeWitt Stern Grp., Inc. v. Eisenberg*, 13-cv-3060, 2013 WL 2420835, at *4-5 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through . . . the loss of client relationships and customer goodwill from a breach of a non-compete clause . . . ."); *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) ("It is well established in this Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm.").

Defendant seeks to avoid a finding of irreparable harm by arguing that Solomon lost SK's business due to its own failures and, as a result, Solomon could never "recover" the SK account. (Opp'n 4.) This argument has no basis in law. Defendant does not cite, nor is the Court aware of, any authority requiring an employer to demonstrate an ability to "recover" a lost account to prevail on a motion for preliminary injunction. In fact, irreparable harm results precisely because of the damage caused by the *loss* of business and good will. Moreover, Choi's attempts to cast SK as a "former" client of Solomon are unsupported by the record. (*See* Christian Pak Decl. ¶ 4, Mar. 2, 2016, ECF No. 14 (stating that two SK companies recently renewed insurance policies with Solomon).) SK was not a "dormant" client. (*See* Opp'n 10 (citing *Leon M. Reimer & Co., P.C. v. Cipolla*, 929 F. Supp. 154, 159 (S.D.N.Y. 1996).) Rather, up until the very date that Choi took over the SK account, Solomon was the broker of record for SK's health benefits business. (*See* Choi Aff. ¶¶ 40-44 (explaining SK changed its broker of record in December 2015); Lee Aff. ¶¶ 12-13 (same).) Indeed, save the health benefits account at issue, Solomon continues to serve as SK's insurance broker across many of SK's businesses. (*See* Pak Decl. ¶ 3, Mar. 2, 2016 (stating that "several different SK entities maintain P&C coverage with [Solomon]").)

Defendant's argument that there can be no irreparable harm because damages in this type of case are "easily quantifiable" (Opp'n 1) has already been rejected by the Second Circuit. In *Ticor Title Insurance Co. v. Cohen*, the Second Circuit concluded "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." 173 F.3d 63, 68 (2d Cir. 1999). The same is true in this case. *See Devos, Ltd. v. Record*, 2015 WL 9593616, at *8 (observing "it has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction").

Moreover, the Employment Agreement contains an acknowledgement by Choi that a breach thereof will cause irreparable harm to Solomon. (Compl. Ex. A, at 14.) Although not controlling, the acknowledgement certainly adds further support for a finding of irreparable harm. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d at 68-69 ("[T]he employment contract sought to be enforced concedes that in the event of [defendant's] breach of the post-employment competition provision, [plaintiff] shall be entitled to injunctive relief, because it would cause irreparable injury. Such . . . might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision."); *see also N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (affirming grant of preliminary injunction in part because "[defendant] acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to [plaintiff]"). These facts, taken together, make a clear showing that Solomon will be irreparably harmed if Choi is permitted to breach the restrictive covenant by continuing to work with SK.

II.     Likelihood of Success on the Merits on the Breach of Contract Claim

To successfully bring a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the contract; (3) that the defendant failed to perform his or her obligations thereunder; and (4) that plaintiff was thereby damaged." *Brooklyn 13th Street Holding Corp. v. Nextel of N.Y., Inc.*, No. 11-cv-1048, 2011 WL 6945862, at *3 (E.D.N.Y. Dec. 30, 2011).

A.  Existence of a Contract

Defendant contends that Plaintiff cannot establish a likelihood of success on its breach of contract claim because the writing upon which Plaintiff relies is not an enforceable contract, but is instead nothing more than an employee handbook. (Opp'n 6-9.) Of course, if the document at issue is construed as an employee handbook, it would be difficult for Plaintiff to make a clear showing that Defendant acted in breach of contract. (*Id.*) That is because the "mere existence of a written policy . . . does not . . . give rise to a legally enforceable claim." *Langenkamp v. Olson*, 628 Fed. App'x 50, 52 (2d Cir. 2015) (quoting *De Petris v. Union Settlement Ass'n, Inc.*, 86 N.Y.2d 406, 410 (N.Y. 1995)). Additionally, "[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements." *Id.* (quoting *Lobosco v. N.Y. Tel. Co./NYNEX*, 96 N.Y.2d 312, 317 (N.Y. 2001)). However, the Court finds Defendant's reading of the document inconsistent with its terms.

It is true that the first eleven pages of the document set forth general policies of Solomon that appear to be applicable to all of its employees. (*See* Compl. Ex. A, at 1.) Even the cover letter to the document acknowledges that it serves as an employee handbook. That same cover letter, however, provides convincing evidence that a portion of the document was also intended to serve as an employment agreement once signed by the employee and countersigned by the president of Solomon. Specifically, the letter states that:

8

> Employment at Solomon Agency is on an "at will" basis, which means that either you, the employee or Solomon Agency may terminate the employment relationship at any time, for any reason, with or without cause. Only a written agreement, signed by the President of Solomon Agency can change the "at will" nature of the employment of any individual.

(*Id.*)

Moreover, all of the indicia of an employment contract appear in the final three pages of the fourteen-page document. At the top of page twelve appears the heading "Agreement of Employment." (*Id.* at 12.) Immediately following are terms applicable only to Choi, including the dates of his employment, his title, specific duties, and compensation. (*Id.*) Notably, the document also includes an acknowledgement that Choi read, among other things, the "Agreement of Employment." (*Id.* at 14.) Finally, the document is signed by not only Choi but also Ha, Solomon's president and CEO. In other words, this is the very sort of "written agreement" contemplated in the cover letter, which converted the "at will" nature of Choi's employment to one governed by contract. For these reasons, the Court finds that Choi's employment was governed by contract.

B. Enforceability of the Restrictive Covenant

The existence of a contract notwithstanding, the question of whether the restrictive covenant is enforceable, requires a different inquiry. That is, "[a]n employee agreement not to compete will be enforced only if 'it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'" *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214-15 (S.D.N.Y. 2013) (quoting *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 9 A.D.3d 805, 806 (3d Dep't 2004)) (alteration in original).

### 1. Necessary to Protect Legitimate Business Interests

"Under New York law, an employer has a legitimate interest in . . . its relationships with its customers . . . ." *IDG USA, LLC v. Schupp*, 416 Fed. App'x 86, 87-88 (2d Cir. 2011) (summary order); *see also BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 391-92 (N.Y. 1999) (finding that an employer has a legitimate business interest in protecting former employees from exploiting client relationships and goodwill that an employee acquired only as a result of his employment). This is all the more true when that client relationship was built and maintained at the employer's expense and through use of the employer's resources. *See Devos, Ltd. v. Record*, 2015 WL 9593616, at *12 ("Courts to have considered this issue under New York law have recognized that employers generally possess a legitimate business interest in protecting client relationships which were developed by a former employee at the employer's expense."); *Johnson Controls, Inc. v. APT Critical Sys., Inc.*, 323 F. Supp. 2d at 535 ("Furthermore, whether viewed conceptually as a type of special service, an offshoot from an employer's interest in safeguarding customer information, or as a distinct cognizable interest, it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense.").

Since 2007, Solomon has acted as SK's broker of record for its health benefits business, as well as other of its insurance policies. (*See* Lee Aff. ¶ 2; Ha Decl. ¶ 4; Pak Decl. ¶¶ 3-4, Mar. 2, 2016.) During that same period, Choi performed considerable work on the SK account and became "critical" to the operations of SK's business. (Lee Aff. ¶ 3.) Choi's knowledge of the SK account was so unique that following his resignation he worked for Solomon as a "consultant" for nearly seven months to train a replacement and assist in the management of the SK account. Significantly, there is no evidence that Choi had any relationship with SK prior to

his work at Solomon. Thus, it was only through Choi's employment at Solomon that he had the opportunity to develop a relationship with SK. The Court also finds meaningful Choi's own acknowledgement in his Employment Agreement that his "skills and position in this industry are unique." (Compl. Ex. A, at 14.) Based on this record, Solomon has established it has a legitimate business interest in protecting the relationship and goodwill it has developed with SK.

Solomon's legitimate business interest is not defeated by Defendant's allegations that it was Solomon who ruined the relationship with SK and that SK now prefers to work with Choi. *See DeWitt Stern Grp., Inc. v. Eisenberg*, 2013 WL 2420835, at *4 ("[Non-compete] agreements are not found overbroad even if they 'would prohibit [the employee] from accepting business from former clients who voluntarily and without any solicitation chose to continue to do business with [the employee].'") (quoting *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 189-90 (S.D.N.Y. 2011)). The question is whether Choi developed his relationship with SK independently of his relationship with Solomon and without Solomon's resources. *See Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *17 (rejecting former employee's claims that clients were more loyal to him than former employer, creating exception to protectable interest, because "[t]he question is whether [defendant] developed those relationships independently of any efforts or expenditures made by [plaintiff]"). There is no evidence that Choi did.

2. Reasonableness

Plaintiff concedes, as it must, that the restrictive covenant, as written, is impermissibly broad. By its terms, the covenant would prevent Choi from working in the same industry as Solomon, anywhere within 50 miles of Solomon's offices, for a period of two years following his termination. (Compl. Ex. A, at 13 ("[T]he Employee agrees that the Employee will not engage in any businesses of Solomon Agency in which the Employee was engaged at any

11

time during the Term of this Agreement in competition with Solomon Agency . . . with respect to customers located within a 50 mile radius of Employer's office locations during a period of 2 Years from the date of any termination of the Employee's employment").) The Court takes no issue with the temporal scope of the covenant. "[C]ourts addressing similar twenty-four month restrictions on solicitation of former clients in the insurance industry have found them to be reasonable." *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d at 188-89 (citing cases); *see also Willis of New York, Inc. v. DeFelice*, 299 A.D.2d 240, 241-42 (1st Dep't 2002) (finding two-year restrictive period to be reasonable). The geographical parameters and limitations on the clients Choi may serve, however, are far greater than necessary to protect Solomon's legitimate business interest. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d at 392 (finding restrictive covenant unreasonable where it prohibited employee from doing business with clients with whom he did not develop relationship through employer) (citation omitted); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 277 (E.D.N.Y. 2002) (finding geographic limitation in restrictive covenant preventing defendant from servicing clients within 100 miles of New York City or within any "marketing area," as broadly defined by agreement, to be "unreasonable").

At one time, these overly broad provisions may have proved fatal to Plaintiff's effort to enforce the restrictive covenant. However, "[t]he prevailing, modern view rejects a per se rule that invalidates entirely any overbroad employee agreement not to compete." *BDO Seidman v. Hirshberg*, 93 N.Y.2d at 394. Instead, "[i]f a court finds a limitation to be unreasonable, it can 'blue pencil' the covenant to restrict the term to a reasonable . . . limitation and grant partial enforcement for the overly broad restrictive covenant." *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d at 277.

Since filing its motion, Plaintiff has apparently recognized the need to "blue pencil" the

Employment Agreement. In its reply submission Plaintiff contends it now seeks to enforce the restrictive covenant only to prevent Choi from competing with Solomon with respect to those clients with whom he developed a relationship as a result of his employment. (*See* Pl.'s Reply Mem. 10, ECF No. 13 ("[A]n injunction only would preclude Choi from working with SK (and the few other clients for whom Choi worked and developed a relationship while at Solomon).")

Plaintiff's proposed modification does not go far enough. Here, the overbreadth of the restrictive covenant should also be remedied by enforcing the geographic component of the covenant such that the 50-mile radius applies only to the office where Choi was employed. *See Poller v. BioScrip, Inc.*, 974 F.Supp.2d at 220 (finding non-compete provision that prohibited employee from performing restricted work in New York metropolitan area and Long Island to be reasonable where those areas were part of defendant's "territory" during her employment); *Willis of N.Y., Inc. v. DeFelice*, 299 A.D.2d 240, 241-42 ("While the geographical extent of the restrictive covenant is very broad, [defendant] is currently working at the New York office of a competitor of plaintiffs, and it would certainly be reasonable to enforce a restrictive covenant covering New York.").

Defendant suggests "blue penciling" would be inappropriate in this case because it contends doing so would require the Court to "re-write" the contract. However, "[a]bsent overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, partial enforcement, as opposed to invalidating the entire covenant, is justified." *Johnson Controls, Inc. v. APT Critical Sys., Inc.*, 323 F.Supp.2d at 540. The Court does not find evidence of coercion or of the anticompetitive concerns that would advise against "blue penciling." The covenant was not imposed as a condition of Choi's initial or continued employment. Instead,

based on Choi's own testimony, he executed the Employment Agreement in order to receive his bonus check. (Choi Aff. ¶ 10.)

Defendant's contention that this "situation has all the trappings of a contract of adhesion" is unsupported by fact or law. (Opp'n 8 (citing *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997).) "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Klos v. Lotnicze*, 133 F.3d at 168 (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y.1996)). In determining whether an agreement is a contract of adhesion, courts consider whether: (1) the signing party was on notice of the provision; (2) the party's consent was obtained by fraud or overreaching; and (3) the party alleged to have been coerced had any alternatives available to him. *Id.* at 169. None of these factors suggests this was a contract of adhesion.

*First*, in 2011 Choi sent an email to Ha attaching a draft employment agreement, which contained the very same non-compete provision at issue here. (*See* Ha Decl. Ex. A.) It is simply not credible that Defendant was unaware of its terms. *Second*, Defendant has not alleged he signed the employment contract as a result of fraud or overreaching, but to obtain additional compensation in the form of a year-end bonus. *Third*, as an alternative to signing the agreement, Choi could have forgone payment of the year-end bonus. *See Klos v. Lotnicze*, 133 F.3d at 169 (finding no contract of adhesion where consumer defendants were on notice of provision at issue, had other alternatives available to them, and there was otherwise no evidence of fraud or deceit).

Choi also suggests that he signed the contract under duress. Even if true, that would only render the contract voidable, not void. A party alleging duress must repudiate the contract "promptly" or it "will be deemed to have ratified it." *Ianucci v. Segal Co., Inc.*, No. 06-cv-4720,

2006 WL 8407380, at *4-5 (S.D.N.Y. June 27, 2006) (granting temporary restraining order and rejecting claim of duress where employee stayed with employer for two and a half years after signing restrictive covenant) (quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001)). Choi made no effort to repudiate the contract but instead continued to work under its terms for almost a year and a half before he resigned.

    3.  Harmful to the General Public and Unreasonably Burdensome

In New York there is a "general public policy favoring robust and uninhibited competition." *Devos, Ltd. v. Record*, 2015 WL 9593616, at *14 (quoting *Am. Inst. of Chem. Engineers v. Reber-Friel Co.*, 682 F.2d 382, 386-87 (2d Cir. 1982)). The Court has not been presented with evidence that enforcement of the covenant would be harmful to the general public. To that point Defendant argues only that enforcement of the covenant would cause SK to "suffer great hardship." (Reply 14.) The inability of a client to work with its broker of choice is not the sort of harm sufficiently "injurious to the public" to defeat the enforcement of a restrictive covenant. Here, SK still has available to it the vast number of brokerage firms in the New York area to service its health benefits account. *See Johnson Controls, Inc. v. APT Critical Sys., Inc.*, 323 F. Supp. 2d at 538 (finding no evidence restrictive covenant was harmful to public or unreasonably burdensome where defendants would not be deprived of their livelihood and where there was no concern "that New York's financial markets [would] be impaired if defendants [were] prevented from servicing [plaintiff's] clients"); *see also BDO Seidman v. Hirshberg*, 93 N.Y.2d at 393 (finding modified covenant would not offend public interest where "it [could not] be said that the restraint, as narrowed, would seriously impinge on the availability of accounting services in the Buffalo area from which the public may draw, or cause any significant dislocation in the market or create a monopoly in accounting services in that locale").

Moreover, any concerns raised by Defendant about his ability to earn a living (Opp'n 11-12), have been addressed by the Court's modifications to the restrictive covenant.

C. Performance under the Employment Agreement

Defendant argues that even if the Court finds the covenant enforceable, there was no breach because: (1) there is no evidence Choi solicited SK; and (2) Solomon waived enforcement of the restrictive covenant. The Court agrees with Defendant that the record is utterly devoid of facts sufficient to show that Choi solicited SK. The sole piece of evidence proffered on this point is an email from SK to Choi discussing possible changes to SK's operating method. (Reply 7; Marc Jung Decl. Ex. A, ECF No. 16.) Perhaps this email can be read, as Plaintiff urges, to demonstrate that Choi was acting to solicit SK away from Solomon. A more imminently reasonable inference to be drawn from the email is that Choi was making suggestions to the operations of the SK account for the benefit of Solomon. Even if Choi did not solicit SK, Choi is not saved from a finding that he acted in breach. There is no dispute that Choi is currently acting as SK's broker of record. (*See* Compl. ¶¶ 30-31, 36; Lee Aff. ¶¶ 13, 16.) That fact alone constitutes a breach of the restrictive covenant.

The facts in this case do not support the conclusion that Solomon waived enforcement of the restrictive covenant. Defendant offers some scant authority that a restrictive covenant cannot be enforced where an employer aids an employee in obtaining competing employment. (Opp'n 15 (citing *Int'l Shared Servs., Inc. v. McCoy*, 259 A.D.2d 668, 669 (2d Dep't 1999).) However, Defendant has proffered no evidence that Solomon assisted Choi in working for any competing business. To the contrary, Choi's work on the SK account following his resignation was done for the benefit of Solomon and paid for by Solomon. Choi admits as much in his declaration where he states "I explained to Ha that I had kept things together *for Solomon* as a part-time

independent contractor for the past six months getting paid only $50/hr." (Choi Aff. ¶ 41 (emphasis added).)

III. Balance of Hardships and Public Interest

Having established that: (1) Solomon is likely to suffer irreparable harm absent an injunction; and (2) as modified, the covenant will not result in undue burden to Choi, nor act against the public interest, the Court finds the balance of hardships tips in favor of granting the injunction.

IV. Bond

Pursuant to Fed. R. Civ. Proc. 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c). "[D]istrict courts in the Second Circuit are vested with wide discretion in determining the amount of the bond that the moving party must post." *Johnson Controls, Inc. v. APT Critical Sys., Inc.*, 323 F. Supp. 2d at 541. Here, Defendant has requested that Plaintiff post a bond in the amount of one million dollars. (Opp. Br. at 18.) Defendant has not provided any basis for this amount. Plaintiff has suggested only that in assessing the reasonableness of the bond amount, the Court consider that Choi's annual salary was approximately $105,000. (*See* Reply 10; Compl. Ex. A, at 12.) The Court finds that a bond of $350,000 is a reasonable amount to cover Defendant's potential damages and costs related to the defense of the action, in the event that there is a subsequent determination that the preliminary injunction was improperly granted.

## CONCLUSION

As set forth above, the Court grants, in part, and denies, in part, Plaintiff's request for a preliminary injunction. Pending a final determination on the merits, or a subsequent order by this Court vacating this preliminary injunction, it is hereby ordered that: Defendant is enjoined from soliciting or providing any insurance brokerage services to any current or former clients of Solomon, with whom Defendant worked during his employment at Solomon and with whom Defendant did not have a pre-existing relationship, and who are located within 50 miles of the Solomon office where Defendant was primarily employed. This preliminary injunction shall not take effect until Plaintiff has posted a bond in the amount of $350,000, which Defendant shall post no later than May 30, 2016.

SO ORDERED.

LASHANN DEARCY HALL
United States District Judge

Dated: Brooklyn, New York
May 16, 2016